UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

NM HOLDINGS COMPANY, LLC, et al.,

                            Debtors.
_____/

STUART A. GOLD, Trustee,

                Plaintiff,

v.

DELOITTE & TOUCHE, LLP,

                Defendant.
_____/

Case No. 03-48939
(Jointly Administered)
Chapter 7
Judge Thomas J. Tucker

Adv. Pro. No. 06-4615

**OPINION REGARDING DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

In this adversary proceeding, the Chapter 7 trustee in eleven jointly-administered

bankruptcy cases seeks damages from Defendant Deloitte and Touche, LLP ("Deloitte") of more

than $300 million.[1]  The trustee claims that Deloitte committed malpractice in its pre-petition

work as the Debtors' independent auditor; that Deloitte aided and abetted multiple breaches of

fiduciary duty by the Debtors' sole shareholder; and that pre-petition fees that Debtors paid for

Deloitte's services are avoidable fraudulent transfers.

The case is before the Court on Deloitte's motion to dismiss all counts in Plaintiff's First

Amended Complaint.[2]  Plaintiff's First Amended Complaint contains four counts: "Count I -

_____

    [1] *See* First Am. Compl. (Docket # 79) at 2 ¶ 2.

    [2] Docket # 85.

Professional Negligence"; "Count II - Aiding and Abetting Breach of Fiduciary Duty"; "Count III - Disgorgement of Fees"; and "Count IV - Fraudulent Transfers."[3]

The Court held a hearing on the motion, and then received and reviewed supplemental briefs.[4] The Court concludes that Deloitte's motion to dismiss should be granted as to all counts, because: (1) Plaintiff's claims for aiding and abetting breach of fiduciary duty (Count II), and for avoidance of fraudulent transfers (Count IV) are barred by the applicable statutes of limitations; (2) Plaintiff's claim for disgorgement of fees (Count III) is not a separate cause of action, but rather is only a possible remedy for the claims in Count I or Count II; and (3) Plaintiff cannot establish the causation element of his professional negligence claim (Count I).

## I. Background

### A. The Venture Holdings bankruptcy cases

This adversary proceeding arises out of the chapter 11 bankruptcy cases filed by Venture Holdings Company, LLC and ten related entities.[5] Those eleven cases are jointly administered under Case No. 03-48939. (The eleven Debtors in those cases are referred to in the opinion collectively as "Venture.")

The Court denied confirmation of Venture's second amended joint chapter 11 plan, on January 21, 2005, and later approved the sale of substantially all of Venture's assets. The sale

---

[3] Docket # 79.

[4] Docket ## 103, 106, 108.

[5] These related entities were: Vemco, Inc. (Case No. 03-48940), Venture EU Corporation (Case No. 03-48941), Venture Leasing Company (Case No. 03-48942), Venture Service Company (Case No. 03-48943), Vemco Leasing, Inc. (Case No. 03-48944), Venture Mold & Engineering Corporation (Case No. 03-48945), Venture Industries Corporation (Case No. 03-48946), Experience Management LLC (Case No. 03-48947), Venture Europe, Inc. (Case No. 03-48948), and Venture Holdings Corporation (Case No. 03-48949).

2

closed on May 2, 2005.[6] On January 11, 2006, the Chapter 11 cases were converted to Chapter 7. Stuart A. Gold ("Gold") was appointed the Chapter 7 Trustee on January 19, 2006.

## B. This adversary proceeding

On March 31, 2006, Gold filed a complaint alleging professional negligence against Deloitte in the Wayne County, Michigan Circuit Court. Deloitte removed the case to this Court, and filed a motion to dismiss the complaint.[7] Gold later filed his first Amended Complaint, and Deloitte filed its present motion to dismiss the amended complaint.

Gold's First Amended Complaint retained the professional negligence count, and added counts for aiding and abetting breach of fiduciary duty; disgorgement of fees; and for the avoidance and recovery of fraudulent transfers.

The First Amended Complaint is 68 pages long and contains 347 paragraphs. It includes the following allegations. Deloitte served as an "independent auditor" for Venture "from 1987 through at least May 2004."[8] During this time period, Larry Winget ("Winget"), Venture's sole shareholder, caused Venture to transfer millions of dollars to other, non-debtor entities controlled

---

[6] As a result of this sale, The Venture Debtors changed their names to: NM Holdings Company LLC (f/k/a Venture Holdings Company LLC), NM Emco, Inc. (f/k/a Vemco, Inc.), NM EU Corporation (f/k/a Venture EU Corporation), NM Old Leasing Company (f/k/a Venture Leasing Company), NM Service Company (f/k/a Venture Service Company), NM Nemco Leasing, Inc. (f/k/a Vemco Leasing, Inc.), NM Mold & Engineering Corporation (f/k/a Venture Mold & Engineering Corporation), NM Industries Corporation (f/k/a Venture Industries Corporation), NM Exp LLC (f/k/a Experience Management LLC), NM Europe, Inc. (f/k/a Venture Europe, Inc.), and NM Holdings Corporation (f/k/a Venture Holdings Corporation).

[7] Docket # 5.

[8] First Am. Compl. (Docket # 79) at 2 ¶ 1.

3

by Winget in return for little or no value.[9] Deloitte knew about some of these related-party transactions, and knew that they were "improper," "grossly unfair" to Venture, and "not bona-fide business transactions."[10] Despite this knowledge, Deloitte issued unqualified audit reports on Venture's 1995 through 2001 financial statements, in which it failed to disclose many of these transactions, and in which it reported that many other of the transactions were fair to Venture and "'on terms no less favorable to the company than would be obtained if such transactions or arrangements were arms-length transactions with non-affiliated persons.'"[11] "[Deloitte] knew that [the unqualified audit reports] would be relied upon by Venture and by third parties, including Venture's creditors."[12]

The First Amended Complaint also alleged that if Deloitte had properly reported these related-party transactions, "independent third-parties with the power to stop and prevent the continuation of such ongoing transactions would have done so, preventing Winget from further siphoning Venture's assets."[13] These independent third parties were certain secured creditors, unsecured noteholders, and an independent member of a "Fairness Committee" that was formed under the indentures relating to the notes Venture issued prior to 2000.[14] The credit agreement relating to the secured debt, and the indentures related to the unsecured notes, prohibited Venture

---

[9] *Id.* at 2 ¶ 2, 3 ¶ 4.

[10] *Id.* at 2 ¶ 3, 3 ¶ 4.

[11] *Id.*

[12] *Id.* at 6 ¶ 21.

[13] *Id.* at 3 ¶ 5.

[14] *Id.* at 61-63 ¶¶ 302-316.

4

from engaging in any unfair related-party transactions or making any distributions to Winget during the term of the loans.[15]

Gold alleges that one of the indentures "required the formation of a 'Fairness Committee' to review related-party transactions [and] . . . required at least one member of the Fairness Committee to be independent of Venture and its principals, which independent member effectively wielded veto power over related-party transactions."[16] Maurice Williams was an independent member of the Fairness Committee, who was innocent and had no knowledge of any misconduct by Winget, and "was empowered to evaluate and approve or disapprove of any related-party transactions undertaken by Winget."[17] "Mr. Williams possessed greater corporate power than an officer or director of Venture, because he had the unilateral and absolute authority to prevent Winget from undertaking or continuing any unfair related-party transactions."[18]

This is so, Gold alleges, because Venture's related-party transactions were "'an event of default' under the indentures."[19] "[I]f [Deloitte] had properly and timely disclosed the unfairness of the related-party transactions, or refused to issue a clean audit opinion if Venture refused to make proper disclosures, the noteholders or the Trustees under the governing indentures properly would have declared a default."[20] To cure this default, Winget would have had to stop making

---

[15] *Id.* at 61-62 ¶¶ 302-306.

[16] *Id.* at 63 ¶ 312.

[17] *Id.* at 64-65 ¶ 321.

[18] *Id.* at 65 ¶ 321.

[19] *Id.* at 63 ¶ 315.

[20] *Id.* at 63 ¶ 316.

unfair related-party transactions.[21]  Venture would be in a better financial condition, if Winget

had been compelled to stop causing Venture to make unfair related-party transactions.[22]

## II.  Jurisdiction

### A.  Subject matter jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C.

§§ 1334(b), 157(a) and 157(b)(1), and Local District Court Rule 83.50(a) (E.D. Mich.).  At a

minimum, the Chapter 7 Trustee's claims are all "related to" the jointly-administered Venture

bankruptcy cases.[23]  The parties do not dispute this.

### B.  Core vs. non-core

"[A] bankruptcy court 'must examine each cause of action separately to determine if it is

core or non-core.'"  *Bliss Technologies, Inc. v. HMI Industries, Inc.* (*In re Bliss Technologies,*

*Inc.*), 307 B.R. 598, 602 (Bankr. E.D. Mich. 2004)(citations omitted).  Gold's claim to recover

fraudulent transfers (Count IV) is a core proceeding under 28 U.S.C. § 157(b)(2)(H).  For the

reasons stated below, the Court will enter an order dismissing this claim with prejudice.

The other claims in the First Amended Complaint — Count I (Professional Negligence),

Count II (Aiding and Abetting Breach of Fiduciary Duty) and Count III (Disgorgement of Fees)

---

[21]  *Id.*

[22]  *Id.* at 63 ¶ 317.

[23]  *See* 28 U.S.C. §§ 1334(b) and 157(a).  Section 1334(b) provides that "district courts have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  Under § 157(a), a district court may refer "any and all cases under title 11 and any all proceedings arising under title 11 or arising in or related to a case under title 11" to bankruptcy judges.  The United States District Court for the Eastern District of Michigan accomplishes this referral through Local Rule 83.50(a)(1) (E.D. Mich.).

6

— are non-core, as the parties appear to acknowledge.[24]  The parties have not consented to the

bankruptcy court entering final judgment on these non-core claims, under 29 U.S.C. § 157(c)(2).

As to these claims, therefore, this opinion states the Court's proposed findings of facts and

conclusions of law, *see* 28 U.S.C. § 157(c)(1), and the Court will recommend that the United

States District Court dismiss these claims.[25]

---

[24] Report of Parties' Rule 26[(f)] Conference (Docket # 16) at unnumbered p. 3.

[25] As this Court explained in  *Bliss Technologies, Inc. v. HMI Industries, Inc.* (*In re Bliss Technologies, Inc.*), 307 B.R. 598, 602-03 (Bankr. E.D. Mich. 2004):

> A bankruptcy court has the authority to determine whether a proceeding
> is core or non-core under 28 U.S.C. § 157(b)(3), which provides:
>
>> The bankruptcy judge shall determine, on the judge's
>> own motion or on timely motion of a party, whether a
>> proceeding is a core proceeding under this subsection or
>> is a proceeding that is otherwise related to a case under
>> title 11. A determination that a proceeding is not a core
>> proceeding shall not be made solely on the basis that its
>> resolution may be affected by State law.
>
> Resolution of the core/non-core issue will determine the extent of the
> bankruptcy court's authority to enter a final order or judgment on the
> claims over which it has subject matter jurisdiction. Consistent with
> *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458
> U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Court may hear and
> determine all "core proceedings."  The bankruptcy court may also hear
> non-core proceedings but may not enter a final judgment. In non-core
> proceedings, the bankruptcy court must:
>
>> submit proposed findings of fact and conclusions of law
>> to the district court, and any final order or judgment
>> shall be entered by the district judge after considering
>> the bankruptcy judge's proposed findings and
>> conclusions and after reviewing de novo those matters to
>> which any party has timely and specifically objected.
>
> 28 U.S.C. § 157(c)(1).

(citations omitted).

7

### III.  Applicable legal standards

Deloitte brings its motion to dismiss under Fed.R.Civ.P. 12(b)(6), applicable in this adversary proceeding through Fed.R.Bankr.P. 7012, arguing that Gold's First Amended Complaint fails to state a claim upon which relief can be granted.

A motion under Rule 12(b)(6) tests the "sufficiency of [a] complaint." *Conley v. Gibson*, 355 U.S. 41, 45 (1957).  A court must examine the plaintiff's allegations and determine whether, as a matter of law, "the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993).  "[A] court considering a motion to dismiss under Rule 12(b)(6) 'must accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff.'" *Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 605 (6th Cir. 2005)(quoting *Inge v. Rock. Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002)(citing *Turker* v. *Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 456 (6th Cir. 1998))).

Recently, in *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955 (2007), the United States Supreme Court revisited the standards that govern Civil Rule 12(b)(6) dismissal motions.  In doing so, the Court rejected "'the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Twombly*, 127 S. Ct. at 1968 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  As the Court explained,

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]"  While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the

8

"grounds" of his "entitle[ment] to relief" **requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.] Factual allegations must be enough to raise a right to relief above the speculative level**, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]

*Twombly*, 127 S. Ct. at 1964-65 (2007)(emphasis added)(citations and footnote omitted). The

*Twombly* Court went on to hold that:

a claim requires a complaint with enough factual matter (taken as true) to suggest [grounds for relief]. Asking for plausible grounds to infer [a right to relief] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [an entitlement to relief]. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely."

*Id.* at 1964-65 (2007)(citations omitted).

## IV. Discussion

### A. Deloitte's statute of limitations arguments

The parties agree that Michigan law applies to all of Gold's claims except the fraudulent

transfer claim under 11 U.S.C. § 548. Deloitte argues that all of Gold's claims are barred by the

statute of limitations. As the party asserting this affirmative defense, Deloitte has the burden of

pleading and proving that the applicable statute of limitations bars the claims. *See Attorney*

*General ex rel. Dept. of Environmental Quality v. Bulk Petroleum Corp.*, 741 N.W.2d 857, 864

(Mich. Ct. App. 2007); *Schaendorf v. Consumers Energy Co.,* 739 N.W.2d 402, 406-07 (Mich.

Ct. App. 2007); *Estate of Bratton v. Trojan Boat Co.*, 172 N.W.2d 457, 460-61 (Mich. Ct. App.

1969).

### 1. Count I - Professional Negligence

9

It is undisputed that the statute of limitations applicable to Count I for professional

negligence is the two year statute of limitations under Mich. Comp. Laws Ann. § 600.5805(6).

That statute provides:

> (1)  A person shall not bring or maintain an action to recover
> damages for injuries to persons or property unless, **after the claim
> first accrued to the plaintiff or to someone through whom the
> plaintiff claims**, the action is commenced within the periods of
> time prescribed by this section.
>
> * * *
>
> (6)   Except as otherwise provided in this chapter, the period of
> limitations is 2 years for an action charging malpractice.

Mich. Comp. Laws Ann. §§ 600.5805(1), (6) (emphasis added).

Mich. Comp. Laws Ann. § 600.5838(1) controls when a malpractice claim "first

accrued."  It states:

> (1)  Except as otherwise provided in section 5838a, a claim based
> on the malpractice of a person who is, or holds himself or herself
> out to be, a member of a state licensed profession **accrues at the
> time that person discontinues serving the plaintiff in a
> professional or pseudoprofessional capacity as to the matters
> out of which the claim for malpractice arose**, regardless of the
> time the plaintiff discovers or otherwise has knowledge of the
> claim.

(bold and italics added).[26]  This statute codified  the common-law "last treatment rule," which

applied to licenced medical professionals, and expanded it so that it applied to all licensed

_____

[26]  Mich. Comp. Laws Ann. § 600.5838(2) contains a discovery rule applicable to malpractice
actions, which allows an action to be filed "within 6 months after the plaintiff discovers or should have
discovered the existence of the claim."  Gold does not argue that this discovery rule saves his malpractice
claim, and it does not.  Gold does not dispute that his predecessors-in-interest, the Venture debtors, had
discovered the malpractice claim against Deloitte more than six months before Gold filed his complaint
on March 31, 2006.  _See_ discussion in Section IV-A-1-b-i of this opinion (regarding the Doeren Mayhew
report issued on March 10, 2004).

professionals. *Levy v. Martin*, 620 N.W.2d 292, 296-97 (Mich. 2001)(per curiam); *see also Morgan v. Taylor*, 451 N.W.2d 852, 855, 856 n.14 (Mich. 1990). The parties disagree on how to apply this codified "last treatment rule" to the facts of this case.

By its terms, § 600.5838(1) requires the Court to make two determinations: (1) the "scope of the matters out of which the claim for malpractice arose;" and (2) the date when the defendant, against whom the malpractice claim is asserted, stopped serving the plaintiff as to those matters.

### a. The scope of "the matters out of which the claim for malpractice arose"

#### i. Deloitte's position

Deloitte argues that because Gold's "complaint alleges that [Deloitte] committed malpractice when it issued unqualified audit reports on Venture's financial statements for the years 1995 through 2001," these unqualified reports are "the matters out of which the claim for malpractice arose" under Mich. Comp. Laws Ann. § 600.5838(1).[27] Deloitte argues that "any malpractice claim against [Deloitte] accrued when [Deloitte] issued the last of [its "unqualified audit reports on Venture's financial statements for the years 1995 through 2001"] on April 8, 2002, and the deadline for any claim against [Deloitte] was April 8, 2004."[28] Because Gold's complaint was not filed until March 31, 2006, the malpractice claim is barred by the 2-year statute of limitations. According to Deloitte, although it was employed by Venture to conduct audits after April 8, 2002, those audits were separate from the audits it performed up until April 8, 2002. Deloitte states, regarding its audit work on Venture's 1995 through 2001 financial

---

[27] Memorandum in Supp. of Deloitte Mot. To Dismiss (Docket # 7) at 15-16.

[28] *Id.* at 15.

statements: "Each of those audits was a separate engagement – separate from each other, and separate from [Deloitte's] subsequent work for Venture."[29]

### ii. Discussion of Michigan case law

Deloitte's narrow interpretation of the phrase "the matters out of which the claim for malpractice arose," is not supported by Michigan cases interpreting § 600.5838(1). In *Levy v. Martin*, 620 N.W.2d 292 (Mich. 2001), the Michigan Supreme Court rejected such a narrow interpretation of this phrase, under facts analogous to the facts here.

In *Levy*, the defendants were accountants who prepared the plaintiff's annual tax returns for the years 1974 through 1996. *Levy,* 620 N.W.2d at 293. In August 1997, the plaintiff filed a lawsuit against the accountants alleging malpractice regarding the 1991 and 1992 tax returns. Those tax returns were prepared and filed by the accountants in 1992 and 1993. *Id.* The trial court held that the malpractice claim was barred by the two-year statute of limitations, and the Michigan Court of Appeals affirmed. *Id.* The Michigan Court of Appeals viewed "the preparation of each year's tax returns as inherently involving a completely separate transaction[.]" *Id.* at 296 n.3. The court of appeals stated that "'[e]ach individual tax return reflects the examination of a discrete, contained body of information.'" *Id.* at 295.

The Michigan Supreme Court reversed the court of appeals, explaining that *Morgan v. Taylor*, 451 N.W.2d 852 (Mich. 1990) had interpreted the phrase "the matters out of which the claim for malpractice arose" broadly. *Id.* at 297. It explained that in *Morgan*, the court held that a defendant doctor's periodic eye examinations of a patient, rather than the treatment for any

---

[29] *Id.* at 16; *see also id.* at 18-19.

particular ailment, were "the matters out of which the claim for malpractice arose." *Id.* In *Levy,*

the Michigan Supreme Court agreed with the holding in *Morgan* and stated:

> While not articulated in *Morgan,* we note that its result seems to
> find support in the statute's use of the plural term "matters" in the
> phrase "the matters out of which the claim for malpractice arose."
> Plainly, this means that the statute of limitations for a nonmedical
> malpractice claim against a state licensed professional does not
> begin to run when the professional has ceased providing services
> with regard to a single matter. On the contrary, the statute of
> limitations begins to run only when the professional has ceased
> providing services as to the broad "matters" out of which the claim
> arises. **This indicates that a continuing course of eye**
> **examinations (or preparation of income tax returns) should be**
> **considered the "matters" out of which a claim for malpractice**
> **arose for purposes of the statute, rather than considering the**
> **completion of each eye examination (or tax preparation) to**
> **begin running the statute of limitations with respect to**
> **negligence during that singular matter.**

*Id.* at 297 n.18 (emphasis added). The *Levy* court held that the reasoning of *Morgan* applied to

the facts of the case before it:

> Using the same reasoning, it is clear here that plaintiffs, rather than
> receiving professional advice for a specific problem, were
> receiving generalized tax preparation services from defendants.
> These continuing services, just like the continuous eye
> examinations in *Morgan,* to be consistent with the *Morgan*
> approach, must be held to constitute "the matters out of which the
> claim for malpractice arose."

*Id.* at 297. As a result, the *Levy* court held that the plaintiff's malpractice claim against the

defendant accountant, based on alleged negligence in the preparation of 1991 and 1992 tax

returns filed in 1992 and 1993, respectively, did not accrue under § 600.5838(1) until 1996, when

the accountant prepared the last tax return (tax year 1996) for the plaintiff. *Id.*

Based on the holding and reasoning in *Levy*, the Court rejects Deloitte's argument that the

"matters out of which [Gold's] claim for malpractice arose" were the audit reports on Venture's

13

financial statements for the years 1995 through 2001. Rather, the Court finds that the matters out of which Gold's claim for malpractice arose were a "continuing course of" annual auditing services, which, as discussed below, continued until at least May 2004.

### b. When Deloitte discontinued serving Venture

The next issue is when did Deloitte discontinue providing a continuing course of annual auditing services to Venture. Gold's First Amended Complaint alleges that Deloitte served as Venture's "independent auditor" until "at least May 2004," well after Venture filed bankruptcy.[30] The Court must accept this allegation as true, in ruling on Deloitte's motion to dismiss.

### i. Deloitte's position

Deloitte argues that it discontinued serving Venture on April 8, 2002, partially because it defines "the matters out of which the claim for malpractice arose" narrowly, to mean the audit reports on Venture's financial statements for the years 1995 through 2001, and also because the rationale behind the common law "last treatment rule" requires this result. Deloitte argues that "[t]he rationale for the last treatment rule[, which "originated in medical malpractice cases,"] was that 'the patient, while treatment continues, relies completely on his physician and is under no duty to inquire into the effectiveness of the latter's measures.'"[31] Deloitte argues that

> [c]onsistent with this rationale, the Michigan Supreme Court held in *Morgan* that the last treatment rule applied to routine, periodic medical examinations because "[i]t is the doctor's assurance upon completion of the periodic examination that the patient is in good

---

[30]  *See* First Am. Compl. at 2 ¶ 1.

[31]  Memorandum in Supp. of Deloitte Mot. To Dismiss (Docket # 7) at 16-17 (quoting *Morgan*, 451 N.W.2d at 855).

14

health which induces the patient to take no further action other than scheduling the next periodic examination."[32]

Deloitte argues that the rationale underlying the "last treatment rule" does not apply to this case because it did not issue audit reports on Venture's 2002 and 2003 financial statements, and therefore Deloitte "never gave Venture a 'clean bill of health' that might have induced Venture to do nothing other than schedule the next annual audit."[33] According to Deloitte, this fact should have put Venture on notice that there were problems with its financial statements and that it may be necessary to investigate before its next audit.[34]

Alternatively, Deloitte argues that, for purposes of the codified version of the "last treatment rule" under Mich. Comp. Laws Ann. § 600.5838(1), Venture's hiring of Doeren Mayhew & Co., P.C. ("Doeren Mayhew") in November 2003 to identify and investigate related-party transactions,[35] and Doeren Mayhew's issuance of its report on March 10, 2004 regarding

---

[32] *Id.* at 17 (quoting *Morgan*, 451 N.W.2d at 855).

[33] *Id.*

[34] *Id.*

[35] On August 29, 2003, Venture filed an "Application of Debtors for Authorization to Employ Doeren Mayhew & Company, P.C. as Forensic Accountants Pursuant to Section 327[(c)] of the Bankruptcy Code" (Docket # 544 in the main bankruptcy case (Case No. 03-48939).) The Application summarized the services to be performed by Doeren Mayhew as follows:

> (a) investigating inter-company, shareholder, and related-party transactions and transfers of [Venture] for the six (6) calendar periods 1997 through 2002 and the three (3) months ending on March 31, 2003; (b) identifying the type, amount, date, and source of the above transactions; (c) reviewing specific supporting documentation for each of the identified transactions; and (d) such other services as may be requested by [Venture] and as agreed to by Doeren Mayhew, including but not limited to reviewing potential preferential and fraudulent transfers (as defined in 11 U.S.C. § 547 and 548), both as they relate to inter-company, shareholder and related-party transactions.

(continued...)

15

the related-party transactions, constituted "occurrences," which caused Deloitte to discontinue serving Venture, and which caused a termination of the original relationship and the "air of trustfulness" between Deloitte and Venture.[36]  Deloitte argues that Gold's claim for malpractice therefore accrued in August 2003 upon the hiring of Doeren Mayhew, or at the latest on March 10, 2004 when Doeren Mayhew issued its report.  That report identified Venture's transactions with nondebtor entities owned or controlled by Winget, and identified potential claims against these entities.  Deloitte relies on *Morgan*, 451 N.W.2d at 856, and the cases cited by *Morgan*, and particularly on *Heisler v. Rogers*, 318 N.W.2d 503, 504-05 (Mich. Ct. App. 1982).

### ii.  Discussion of Michigan case law

As discussed above, Mich. Comp. Laws Ann. § 600.5838(1) plainly states that a malpractice claim accrues when the person against whom the malpractice claim is brought "discontinues serving the plaintiff."  In the context of a relationship that involves a client's periodic use of the professional's services over a period of time, Michigan courts have found that the professional discontinues serving his client when there is an "occurrence."  *See Morgan*, 451 N.W.2d at 856 (footnote omitted).  An "occurrence" is an event that shows that either the professional or the client he is serving intended to discontinue their on-going relationship.  *See id.* at 856 & n.15 (citing medical malpractice cases).  In the cases cited by *Morgan*, some examples of events which courts found to be "occurrences" were when: a patient consulted with attorneys regarding a possible malpractice claim against the professional; a patient decided to

---

[35](...continued)
*Id.* at 3.  On October 9, 2003, the Court granted the Application (Docket # 755), and on November 14, 2003, the Court entered an order authorizing Venture to retain Doeren Mayhew as forensic accountants (Docket # 985).

[36]  *Id.* at 17-18.

transfer to another hospital to be treated by another physician, after having surgery and follow-up care with the defendant physician; the plaintiff consulted with other doctors and asked attorneys about the possibility of a malpractice claim against the defendant physician; and the plaintiff decided he or she no longer wanted to be treated by the physician. *Id.* The *Morgan* court also discussed with approval the case relied upon by Deloitte, *Heisler v. Rogers*, 318 N.W.2d 503 (Mich. Ct. App. 1993). *Id.* at 855-56. The *Morgan* court agreed with the *Heisler* court that "'[t]he essence of the last treatment rule is that the cessation of the ongoing patient-physician relationship marks the point where the statute of limitations begins to run.'" *Id.* at 855 (quoting *Heisler v. Rogers*, 318 N.W.2d 503, 504 (Mich. Ct. App. 1993)).

In *Heisler*, the defendant physician performed a laminectomy on the plaintiff patient in March 1972. *Heisler*, 318 N.W.2d at 504. After the surgery, the physician told the patient that he had left part of a needle in the patient's back, but that this would not harm him. *Id.* at 506. The physician had his last follow-up visit with the plaintiff in September 1972. *Id.* at 504. During the next six years, the patient had no further contact with the physician. During that six-year period, however, the patient sought and received treatment at the Mayo Clinic several times, beginning in 1974, which included a ten-day hospital stay, and consulted with and had numerous examinations by two neurosurgeons about back pain. In August 1978, more than six years after his original surgery, and after a neurosurgeon suggested that the plaintiff consult with the physician who had performed the surgery, the patient again sought treatment from the original physician. *Id.* at 504. The *Heisler* court found that the ongoing patient-physician relationship between the plaintiff and the defendant ceased with the last follow-up visit in September 1972, rather than when the plaintiff next visited the defendant in August 1978. *Id.* at 505.

17

The facts in this case are not analogous to the facts in *Heisler* or any of the cases cited by *Morgan*, in which courts found "occurrences" that caused a cessation of the doctor-patient relationship. Under the facts in this case, until at least May 4, 2004, there was no "occurrence" that ended the auditing relationship between Deloitte and Venture, which began in December 1987. There is nothing in the present record to indicate that either Deloitte or Venture intended to end their relationship or to modify it in any way. Rather, the record indicates that Deloitte continued to provide the same type of services to Venture that it had always provided throughout their on-going relationship, at least through May 2004.

Gold cites a fee application that Deloitte filed in the Venture bankruptcy case on May 4, 2004,[37] in which Deloitte made the following representations to the Court:

> Since December of 1987, Deloitte & Touche has been retained by [Venture] to conduct annual audits and quarterly reviews. [Venture has] utilized Deloitte & Touche as its accountants and independent auditors because of Deloitte & Touche's knowledge, reputation and experience as accountants and auditors, and its experience within the automotive industry. As a result of this **existing relationship**, Deloitte & Touche has specialized knowledge of and experience with [Venture] and [its] businesses.

(emphasis added).[38] Deloitte stated further in the fee application that three of the individual audit professionals, who had provided services to Venture during the Application period, had "served on [Venture's] audit prior to the commencement of the Chapter 11 case and will **continue** to

---

[37] Although this document was not attached to Gold's First Amended Complaint, Deloitte states that the Court may take judicial notice of it, in ruling on the motion to dismiss, and Gold also cited this document in his briefs. *See* Memorandum in Supp. of [Def.'s] Mot. to Dismiss (Docket # 7) at 3 n.1; Pl.'s Br. in Opp'n to Deloitte's Mot. to Dismiss (Docket # 10) at 18 n.3.

[38] Third Interim Application for Allowance of Compensation and Reimbursement of Fees and Expenses of Deloitte & Touche LLP, as Accountants and Independent Auditors for the Months of January Through March 2004 (Case No. 03-48939 (Docket # 1853)) at 4 ¶ 7.

render accounting and services to [Venture]."[39]  Notably, Deloitte also stated in the fee

application:  **"Deloitte & Touche *continues* to provide [Venture] with accounting and**

**auditing services in connection with the finalization of the audit of [Venture's] consolidated**

**financial statements for the years ended December 31, 2002 and 2003."**[40]  In the conclusion

of Deloitte's fee application, it stated:

> Deloitte & Touche is assisting [Venture] in finalizing the audit of
> the 2002 and the 2003 consolidated financial statement audit.
> Deloitte and Touche's **past and continued efforts** will facilitate
> (i) the resolution of audit issues and finalization of the 2002 audit,
> (ii) [Venture's] ability to obtain exit financing, and (iii),
> [Venture's] reorganization.[41]

Deloitte's May 4, 2004 fee application supports Gold's allegation in the First Amended

Complaint that "Defendant [Deloitte] was the independent auditor for Venture from 1987

thorough at least May 2004."[42]

The Court rejects Deloitte's argument that either Venture's hiring of Doeren Mayhew in

November 2003, or the issuance of the Doeren Mayhew report on March 10, 2004, was an

"occurrence" which caused the original relationship between Venture and Deloitte to terminate.

Venture did not hire Doeren Mayhew instead of, or to the exclusion of Deloitte, to perform the

type of auditing services that Deloitte had been performing.  Rather, Venture hired Doeren

Mayhew *in addition to* continuing to employ Deloitte, and Doeren Mayhew was to perform

services which were different and distinct from those performed by Deloitte.  Venture hired

---

[39]   *Id.* at 5 ¶ 9 (emphasis added).

[40]  *Id.* at 6 ¶ 13 (emphasis added).

[41]  *Id.* at 9 (emphasis added).

[42]  First Am. Compl. (Docket # 79) at 2 ¶ 1.

Deloitte to perform general accounting and auditing services. Venture hired Doeren Mayhew to investigate a wide range of related-party transactions. Venture did not hire Doeren Mayhew to review the audit work performed by Deloitte.

Similarly, the March 10, 2004 report by Doeren Mayhew, detailing the related-party transactions, was not an "occurrence" terminating Deloitte's auditing services. As detailed above, Deloitte itself stated, almost two months later, in its May 4, 2004 fee application, that Deloitte was continuing to provide auditing services to Venture.

In Michigan, the accrual date of a malpractice claim is now controlled by statute, Mich. Comp. Laws § 600.5838(1), which sets the point at which the claim for malpractice accrues as the time a professional stops providing services to the plaintiff. There is nothing in the wording of the statute to suggest that an accounting malpractice action can accrue before a professional discontinues rendering services, just because the client begins to mistrust the professional at an earlier date. "The Legislature intended that the last day of service be the sole basis for determination of accrual." *Gebhardt v. O'Rourke*, 510 N.W.2d 900, 904 (Mich.1994). Based on the current record, the Court cannot find that Deloitte discontinued serving Venture before May 4, 2004. Therefore, the Court cannot conclude that Gold's malpractice claim, filed on March 31, 2006, is barred by the two-year statute of limitations.

### 2. Count II - Aiding and Abetting Breach of Fiduciary Duty

#### a. The applicable statute of limitations

The parties apparently disagree over what statute of limitations applies to Count II of the First Amended Complaint, which claims that Deloitte aided and abetted Winget's breach of fiduciary duty to Venture. Initially, Deloitte argued that "[b]ecause an action for breach of

20

fiduciary duty sounds in tort, an action for aiding and abetting such a breach is subject to a three-year statute of limitations."[43] But later, Deloitte changed its position and argued that Michigan's two-year statute of limitations for malpractice applies to this claim, because the claim "sounds in negligence, not in tort."[44] Then at the hearing, Deloitte once again argued that the three-year statute applied.

Gold argues that Michigan's two-year statute of limitations for malpractice applies, because the "Trustees's aiding and abetting allegations sound in malpractice regardless of the label attached to the claim[.]"[45] As a result, according to Gold, the codified "last treatment rule" under Mich.Comp.Laws Ann. § 600.5838 applies, and saves the claim.

Although the parties may have agreed, at least at one time, that the two-year statute of limitations for malpractice claims applies to Gold's aiding-and-abetting claim, the Court disagrees. The Court is not bound by any agreement by the parties regarding this issue of law. *See Sinicropi v. Milone,* 915 F.2d 66, 68 (2d Cir.1990)("A court . . . is not bound to accept stipulations regarding questions of law[.]" ); *Travelers Ins. Co. v. Henry,* No. 1:01-cv-250, 2007 WL 1448072, at * 1 (D.Vt. May 14, 2007); *In re Estate of Finlay*, 424 N.W.2d 272, 275 (Mich. 1988). The Court concludes that the two-year statute of limitations for malpractice actions under Mich. Comp. Laws Ann. § 600.5805(6) does not apply. Rather, the three-year statute of limitations in Mich. Comp. Laws Ann. § 600.5805(10) applies.

---

[43]  Defendant Deloitte & Touche LLP's Memorandum In Opp'n To Pl.'s Mot To Amend Scheduling Order And/Or For Leave To File A First Am. Compl. (Docket # 70) at 12.

[44]  Deloitte & Touche LLP's Mot. To Dismiss Pl.'s First Am. Compl. (Docket # 85) at 2 & n.2.

[45]  Reply Br. In Supp. of Pl.'s Mot. To Amend Scheduling Order And/Or For Leave To File A First Am. Compl. (Docket # 76) at 4.

As support for applying the two-year malpractice limitation, Gold relies primarily on the following statement from *Alken-Ziegler, Inc. v. George Bearup, Smith, Haughey, Rice & Roegge, P.C.,* No. 264513, 2006 WL 572571, at *4 (March 9, 2006)(unpublished):

> Claims against attorneys brought **on the basis of inadequate representation** sound in malpractice only, and are governed by the malpractice statute of limitations regardless of the label they are given. The fiduciary relationship created by the general power of attorney document merely contemplated that defendant [attorney] would provide adequate legal services to plaintiff's owner. A similar fiduciary relationship already existed by virtue of [attorney's] dual status as plaintiff's lawyer. Any claim arising out of the fiduciary relationship between plaintiff's owner and defendant [attorney] sounded in legal malpractice only, and was subject to the two-year malpractice statute of limitations

*Id.* (citations omitted)(emphasis added).

First, this case is not considered precedential under Michigan law, because it is an unpublished case. Mich. Ct.R. 7.215(C)(1)(9)("An unpublished opinion is not precedentially binding under the rule of stare decisis.") Second, the Court disagrees with Gold's reading of the *Alken-Zieler* case. Gold views the case as holding that any claim by a client against a professional, such as an attorney or an accountant, can only sound in malpractice. But this is not what *Alken-Ziegler* held. Rather, it held that a client *can* have claims other than malpractice against an attorney, such as a claim for breach of contract:

> "[C]laims against attorneys brought on the basis of inadequate representation sound in tort and are governed by the malpractice statute of limitations, even though a plaintiff may assert that the attorney's actions breached a contract." Attorneys may be held liable under a contract theory, but only when it is shown that the attorney breached a "special agreement" rather than a general agreement to provide requisite skill or adequate legal services. A "special agreement" is a "contract to perform a specific act," as opposed to a general agreement "to exercise appropriate legal skill in providing representation in a lawsuit."

22

*Id.* at 3 (emphasis added)(citations omitted).

Under Michigan law, "[t]he applicable period of limitation depends upon the theory actually pled when the same set of facts can support either of two distinct causes of action." *Barnard v. Dilley*, 350 N.W. 2d 887, 888 (Mich. Ct. App. 1984). Aiding and abetting a breach of fiduciary duty is a separate and distinct claim from a malpractice claim. It has different elements. The key element of a malpractice claim is that the defendant professional breached a duty of care owed to the client. The essence of the claim is negligence by a professional. By contrast, the elements of a claim for aiding and abetting breach of fiduciary duty are: (1) a breach of fiduciary duty by a person; (2) knowledge by the defendant of the other person's breach of fiduciary duty; (3) substantial assistance or encouragement by the defendant to the person breaching the fiduciary duty; and (4) resulting harm. *See* Restatement (Second) of Torts § 876(b) (1979); *see also L.A. Young Spring & Wire Corp. v. Falls,* 11 N.W.2d 329, 343 (Mich. 1943)(a person who knows about a party's breach of fiduciary duty to a third party, and willingly and actively participates in the wrongdoing, is jointly and severally liable to the third party).

Using the words of the *Alken-Ziegler* court, Gold's aiding and abetting claim is not based simply on Deloitte's "general agreement to provide requisite skill or adequate legal services" to Venture. Rather, the claim is based on specific allegations of tortious wrongdoing quite apart from a mere breach of the professional's duty of care. Thus, Count II of Plaintiff's First Amended Complaint pleads a separate and distinct claim from Gold's malpractice claim, and the malpractice statute of limitations does not apply.

There is no Michigan statute of limitations that applies specifically to a claim for aiding and abetting a breach of fiduciary duty. Michigan has two residual statutes that might apply to

such a claim. The first of these is Mich. Comp. Laws Ann. § 600.5805(10) which applies to all actions "to recover damages for the death of a person, or for injury to a person or property" not specifically covered in subsections (1) through (9) of § 600.5805. Under this residual statute, "[t]he period of limitations is 3 years after the time of the death or injury."

The second statute is Mich. Comp. Laws Ann. § 600.5813, which provides a six-year statute of limitations for "[a]ll other personal actions."

In *National Sand, Inc. v. Nagel Construction, Inc.*, 451 N.W.2d 618, 625 (Mich. Ct. App. 1990), the Michigan Court of Appeals stated that "the determination of when to apply § 5805 rather than § 5813 has produced a great deal of confusion and the case law is difficult, if not impossible, to harmonize." The *National Sand* court then concluded that § 5805 should be applied to traditional common-law torts, while § 5813 should be applied when the claim arises from a statute. *Id.* at 622 & n.7, 623.

In *Local 1064, RWDSU AFL-CIO v. Ernst & Young*, 535 N.W.2d 187, 190 (Mich. 1995), the Michigan Supreme Court had to determine whether to apply § 5805 or § 5813 to what it ultimately determined was a malpractice claim against an accounting firm. The court stated that *National Sand* "represents the correct analysis concerning the scope of § 5805." *Id.* at 189-90. Relying on the reasoning of *National Sand*, the court concluded "that § 5805 prescribes the limitation periods for traditional common-law torts, regardless of whether the damages sought are for pecuniary or physical injury," and thus applied in its case. The court next had to determine whether the correct limitation period to apply under § 5805 was the two-year malpractice period under what is now § 600.5805(6), or the three-year residual period under what

is now § 600.5805(10).  The court chose the former, because it concluded that the claim alleged in that case was a common law malpractice claim.  *Id.* at 191, 192.[46]

Following the reasoning in *Local 1064* and *National Sand,* the Court first notes that Gold's aiding and abetting claim is a traditional common law tort claim, rather than a claim arising from a statute.  The claim has long been recognized at common law, both in Michigan and elsewhere.  *See L.A. Young Spring & Wire Corp. v. Falls,* 11 N.W.2d 329, 343 (Mich. 1943); Restatement (Second) of Torts § 876 (1979).[47]  Gold's aiding-and-abetting claim therefore is governed by the residual three-year statute of limitations in Mich. Comp. Laws Ann. § 600.5805(10), rather than by the residual six-year statute in Mich. Comp. Laws Ann. § 600.5813.

### b.  Accrual of a claim subject to Mich. Comp. Laws Ann. § 600.5805(10)

---

[46]  The claim in *Local 1064* was that the defendant accounting firm had "failed to perform the duties for which they were hired and paid, including examining all plaintiff's records, auditing its accounts, and assuring that all payments required by governmental agencies were properly computed and paid."  *Id.* at 188.  In *Local 1064*, there was no allegation of aiding and abetting a breach of fiduciary duty, like there is in this case.

[47] Section 876 of the Restatement (Second) of Torts provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Mich. Comp. Laws Ann. § 600.5827 governs accrual of a claim subject to the three-year statute of limitations in § 600.5805(10). *Trentadue v. Gorton*, 738 N.W.2d 664, 669 & n.8, 670 (Mich. 2007). Section 600.5827 provides:

> Except as otherwise expressly provided, the period of limitations runs from the time the claim accrues. The claim accrues at the time provided in sections 5829 to 5838, and in cases not covered by these sections **the claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results.**

(emphasis added). This case is not covered by sections 5829 to 5838, so Gold's cause of action accrued under Mich. Comp. Laws Ann. § 600.5827 when "the wrong . . . was done." Under this statute, "'the wrong is done when the plaintiff is harmed rather than when the defendant acted.'" *Trentadue*, 738 N.W.2d at 670 (quoting *Boyle v. General Motors Corp.*, 661 N.W.2d 557, 560 n.5 (Mich. 2003)). "Accordingly, a cause of action for tortious injury accrues when all the elements of the claim have occurred and can be alleged in a proper complaint," including harm to the plaintiff. *See Schaendorf v. Consumers Energy Co.*, 739 N.W.2d 402, 406 (Mich. Ct. App. 2007)(citing *Stephens v. Dixon*, 536 N.W.2d 755, 758 (Mich. 1995) and *Chase v. Sabin*, 516 N.W.2d 60 (Mich. 1994)).

### c. Accrual of Gold's claim for aiding and abetting breach of fiduciary duty.

As noted above, the elements of a claim for aiding and abetting breach of fiduciary duty are: (1) a breach of fiduciary duty by a person; (2) knowledge by the defendant of the other person's breach of fiduciary duty; (3) substantial assistance or encouragement by the defendant to the person breaching the fiduciary duty; and (4) resulting harm.

All the elements of Gold's claim for aiding and abetting a breach of fiduciary duty had occurred and could have been alleged in a proper complaint, at the latest, by the *later* of the

26

following dates: (1) April 8, 2002, when Deloitte issued its last unqualified audit report (regarding Venture's 2001 year-end financial statement); and (2) the last alleged date on which Venture suffered harm because of Winget's breaches of fiduciary duty to Venture.

This is so because Winget's alleged breach of fiduciary duty to Venture, which Deloitte allegedly aided and abetted, was Winget's causing Venture to engage in the numerous "unfair related-party transactions" with Winget affiliates.[48] Gold alleges that Deloitte knew of these breaches of fiduciary duty, and that Deloitte provided substantial assistance to Winget by issuing unqualified audit reports on Venture's year-end financial statements for the years 1995 through 2001. According to Gold, these audit reports "failed to disclose many material related party transactions and falsely stated that many other material transactions were fair to Venture when, in fact, those transactions were grossly unfair."[49] In issuing unqualified audit reports, Deloitte provided substantial assistance to Winget because the reports were relied upon by people and entities who had the power to stop Winget from engaging in unfair related-party transactions. Deloitte's issuing the unqualified audit reports thus prevented independent third parties from acting to stop Winget's breach of fiduciary duty.[50]

It is undisputed that Deloitte issued its last audit report, regarding Venture's year-end financial statement for 1991, on April 8, 2002. For all resulting harm to Venture that occurred before April 8, 2002, at least, Gold's aiding and abetting claim(s) accrued, at the latest, on April 8, 2002. But as to resulting harm to Venture that occurred after April 8, 2002, if any, Gold's

_____

[48] Pl.'s First Am. Compl. (Docket # 79) at 66 ¶ 332 ("Winget breached his fiduciary duty to Venture by engaging in the unfair related-party transactions alleged in this Complaint.")

[49] *Id.* at 2 ¶ 3.

[50] *See id.* at 61-65 ¶¶ 302-24.

27

aiding and abetting claim accrued under Mich. Comp. Laws Ann. § 600.5827 when the harm occurred.

The harm to Venture alleged by Gold, of course, is numerous transfers of money from Venture to Winget-related entities, in the unfair related-party transactions. The First Amended Complaint alleges that these transfers occurred between 1987 and the date when Venture filed bankruptcy in March 2003.[51] The Venture bankruptcy cases were filed on March 28, 2003. The harm to Venture, therefore, occurred no later than March 28, 2003 (and substantially earlier, with respect to many of the transfers alleged in the First Amended Complaint). Gold's aiding and abetting claim, therefore, accrued at the latest on March 28, 2003.

---

[51] In the First Amended Complaint, Gold alleges that:

> 1. . . . This action alleges that Deloitte committed professional malpractice in connection with its audits of Venture's financial statements between 1987 and Venture's bankruptcy in March 2003.
>
> 2. **During that time period**, Venture's sole shareholder, Larry Winget ("Winget") caused Venture to enter into dozens of transactions with related parties also controlled by Winget. The transactions were grossly unfair to Venture . . .."

*Id.* at 2 ¶¶ 1, 2 (emphasis added).

The First Amended Complaint describes numerous specific transfers of funds from Venture to Winget-related entities, which Gold alleges were unfair related-party transactions. All of these transfers are alleged to have occurred before (and in many cases years before) March 2003, or "between" a specified date and "March 2003" or, in a few cases, "from" a specified date "through March 2003." *Id.* at ¶¶ 38, 41, 42, 48, 49, 62, 64, 67, 75, 76, 88, 102, 104, 108, 125, 127, 138, 140, 141, 143, 156, 158, 161, 166, 183, 185, 199, 201, 203, 205, 207, 210, 220, 221, 224, 226, 227, 228, 229, 242, 244, 251, 260, 261, 262, 269, 271.

Given Gold's allegation in ¶¶ 1 and 2 of the First Amended Complaint that the unfair related-party transactions were done "between 1987 and Venture's bankruptcy in March 2003," the Court construes the First Amended Complaint as alleging that all of the transfers were done no later than when Venture filed bankruptcy on March 28, 2003.

28

Under Mich. Comp. Laws Ann. § 600.5805(10), Gold was required to file a complaint against Deloitte within three years after the claim accrued; *i.e.,* no later than March 28, 2006. Because Gold did not file this action until March 31, 2006, his aiding and abetting claim is barred by Mich. Comp. Laws Ann. § 600.5805(10).[52]

### d. No tolling applies under Mich. Comp. Laws Ann. § 600.5805(10).

Gold argues that the applicable statute of limitations for his aiding and abetting breach of fiduciary duty claim "was tolled under the doctrine of adverse domination," because of Winget's domination of Venture.[53]   Applying current Michigan case law, the Court must reject this argument.

The "doctrine of adverse domination" is a form of "equitable tolling" or "judicial tolling," and "is usually discussed in the context of statutes of limitations."   *Devillers v. Auto Club Ins. Ass'n*, 702 N.W. 2d 539, 558 n.1 (Mich. 2005) (Cavanagh, J., dissenting).   The doctrine tolls the running of the statute of limitations for as long as the plaintiff corporation was controlled by or dominated by the alleged wrongdoer.   *See Adelphia Communications Corp. v. Bank of America, N.A.* (*In re Adelphia Communications Corp.*), 365 B.R. 24, 58 (Bankr. S.D.N.Y. 2007)(applying Pennsylvania law).   Until recent years, at least, Michigan cases recognized this common law tolling rule.   *See, e.g., Pontiac Packing Co. v. Hancock*, 241 N.W. 268, 270 (Mich. 1931).

---

[52]   Because the Michigan limitations period had not yet ended when Venture filed bankruptcy on March 28, 2003, Bankruptcy Code § 108(a)(1) gave Venture, and its successor-in-interest Gold, until the later of "the end of" the Michigan limitations period, and "two years after the order for relief," (*i.e.*, March 28, 2005) to file the aiding and abetting claim against Deloitte.   *See* 11 U.S.C. § 108(a).

[53]   Reply Br. in Supp. of Pl.'s Mot. To Amend Scheduling Order and/or for Leave to File a First Am. Compl. (Docket # 76) at 5.

But this common law tolling doctrine is no longer available under Michigan law, after the Michigan Supreme Court's decision in *Trentadue v. Gorton*, 738 N.W.2d 664, 670 (Mich. 2007). In that case, the plaintiff in a wrongful death case argued that the three-year statute of limitations under Mich. Comp. Laws Ann. § 600.5805(10) should be tolled based on the common law discovery rule. The Michigan Supreme Court disagreed. The court listed the several statutory provisions which toll the statute of limitations, and then concluded that "the statutory scheme is exclusive." Because none of the statutory tolling provisions applied to the facts of the case before it, the Court held that the statute of limitations could not be tolled. *Id.* at 670. The *Trentadue* court explained that "[b]ecause the statutory scheme here is comprehensive, the Legislature has undertaken the necessary task of balancing plaintiffs' and defendants' interests and has allowed for tolling only where it sees fit." *Id.* at 672. Under *Trentadue,* a tolling of the statute of limitations is no longer permitted under any common law doctrine; the tolling must be specified in Michigan's statutory tolling provisions. Because the adverse domination doctrine is not one of the statutory tolling provisions, and because none of the other statutory tolling provisions apply here, the statute of limitations was not tolled.

Gold's claim for aiding and abetting a breach of fiduciary duty therefore is barred by the three-year statute of limitations under Mich. Comp. Laws Ann. § 600.5805(10). The Court will recommend to the district court that this claim (Count II) be dismissed.

### 3. Count III - Disgorgement Of Fees

There is no need to discuss the parties' respective positions on what statute of limitations applies to Gold's claim for disgorgement of fees under Count III of Gold's First Amended Complaint, because the Court holds that this claim is not a valid stand-alone claim. Rather, it is

30

one of the *remedies* that Gold seeks based on Gold's claims in Counts I and II, for malpractice and for Deloitte's alleged aiding and abetting of Winget's breach of fiduciary duties. Count III of the First Amended Complaint does not allege any basis for disgorgement of fees other than the claims in Counts I and II.[54]

The court in *In re Wiand*, Nos. 8:05-cv-1856-T-27MSS, *et al.*, 2007 WL 963165, at *8 (M.D. Fla. March 27, 2007)*, adopt the magistrate judge's finding "that disgorgement is a remedy for an unjust enrichment action, not an independent cause of action" and dismissed a claim for disgorgement with prejudice. In *In re Wiand*, Nos. 8:05-cv-1856-T-27MSS, *et al.*, 2007 WL 963162, at *15 (M.D. Fla. Jan.12, 2007) (citations omitted), the magistrate judge, in her Report and Recommendation, stated:

> [T]he Receiver's disgorgement claim must fail as a matter of law
> because disgorgement is not an independent cause of action. It may
> be a remedy for a viable cause of action at common law or, in some
> circumstances, is provided as a statutory remedy for certain claims.

*Id.; see also Precision Vascular Systems, Inc. v. Sarcos L.C.,* 199 F. Supp.2d 1181, 1193 (D. Utah 2002)("Clearly accounting and disgorgement are remedies under Utah law, not separate causes of action.").

---

[54]  *See* Pl.'s First Am. Compl. (Docket # 79) at 67 ¶¶ 338-40. Paragraph 339 of the First Amended Complaint does allege that "[i]n accepting fees for services rendered while it was in breach of its obligations to Venture, Deloitte was unjustly enriched." The Court does not view this as a claim for unjust enrichment, separate from the malpractice claim, however, because the only reason alleged in ¶ 339 as to why Deloitte was "unjustly enriched" is that it breached its obligations to Venture — *i.e.*, that Deloitte committed malpractice. Nor has Gold ever argued that his disgorgement claim in Count III was a claim separate and distinct from his malpractice and aiding-and-abetting claims (Counts I and II). And in arguing the disgorgement claim was not time-barred, Gold simply lumped it with his aiding-and-abetting claim, with no separate discussion. *See* Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss Pl.'s First Am. Compl. (Docket # 90) at 19, incorporating argument contained in Reply Br. In Supp. of Pl.'s Mot. To Amend Scheduling Order And/Or For Leave To File A First Am. Compl. (Docket # 76) at 3-5.

The Court concludes that Michigan courts would agree with these cases. Because Gold's disgorgement claim is not a separate cause of action, the Court will recommend to the district court that this claim be dismissed.

### 4. Count IV - fraudulent transfers

Gold's fraudulent transfer claim is based on both § 548 of the Bankruptcy Code and Michigan's fraudulent transfer statute, Mich. Comp. Laws Ann. § 566.31, *et seq.* Bankruptcy Code § 548 would permit avoidance of fraudulent transfers made up to one year before the filing of the bankruptcy petition. 11 U.S.C. § 548(a)(1).[55] If applicable, the Michigan statute would permit avoidance of fraudulent transfers that occurred up to six years before the filing of Gold's complaint. *See* Mich. Comp. Laws Ann. § 566.34(1)(b).

Unless he is time barred, Gold may assert fraudulent transfer claims under the Michigan statute through § 544(b)(1) of the Bankruptcy Code, which provides:

> (b)(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1). "11 U.S.C. § 544 allows the trustee to step into the shoes of a creditor in order to nullify transfers voidable under state fraudulent conveyance acts for the benefit of all

---

[55] The version of § 548(a)(1) cited here is the version in effect before it was amended by the "Bankruptcy Abuse Prevention and Consumer Protection Act of 2005" ("BAPCPA"). BAPCPA changed the one-year look-back period of § 548(a)(1) to a two-year look-back period. But that amendment became effective only for bankruptcy cases filed "more than 1 year after the date of the enactment of this Act," *i.e.*, after April 20, 2006 (the date of enactment was April 20, 2005, when the President signed the Act into law). *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, § 1406(2), 119 Stat. 23, 216. The amended two-year look-back period therefore does not apply in this case, because the Venture bankruptcy cases were filed well before April 20, 2006.

32

creditors." *Wells v. Sleep* (*In re Michigan Machine Tool Control Corp.*), 381 B.R. 657, 667 n.14 (Bankr. E.D. Mich. 2008)(citing *Corzin v. Fordu* (*In re Fordu*), 201 F.3d 693, 697 n. 3 (6th Cir. 1999)(quotation omitted)), and *Mason v. Young* (*In re Young*), 238 B.R. 112, 114 (B.A.P. 6th Cir. 1999)).

In its motion to dismiss, Deloitte argued that Gold's fraudulent transfer claim "is barred by 11 U.S.C. § 546(a), because [Gold] failed to bring it within one year of his appointment as a trustee."[56]  At the hearing on Deloitte's motion, Gold conceded that the statute of limitations under 11 U.S.C. § 546(a)(1)(A) bars his fraudulent transfer claims brought under both §§ 544 and 548.  However, Gold argued that he is still entitled to bring a so-called "direct" fraudulent transfer claim under Mich. Comp. Laws Ann. § 566.34(1)(b), and take advantage of that statute's six-year look-back period.  Gold claims a right to bring such a "direct" action as successor-in-interest to the Venture debtors.[57]  Gold argues that because of this six-year look back period in state law, he "may pursue state law fraudulent transfer claims based upon transfers from Venture to [Deloitte] that occurred between March 28, 1997 and March 28, 2003."  (*Id.*)

The Court disagrees.  Gold's fraudulent transfer claim under §§ 544 and 548 are indeed time-barred, and Gold may not bring a "direct" action under Mich. Comp. Laws Ann. § 566.34(1)(b).

### a.  Gold's fraudulent transfer claims under §§ 544 and 548

---

[56] Deloitte's Mot. To Dismiss Pl.'s First Am. Compl. (Docket # 85) at 2.

[57] Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss Pl.'s First Am. Compl. (Docket # 90) at 20.

33

First, as Gold conceded at the hearing on Deloitte's motion to dismiss, Gold's fraudulent transfer claims under § 548, and his Michigan-law based fraudulent transfer claim brought under § 544, are barred by the statute of limitations in 11 U.S.C. § 546(a). Section 546(a) provides:

>     (a)     An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of —
>
>     (1)  the later of —
>
>     (A) 2 years after the entry of the order for relief; or
>
>     (B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title **if such appointment or such election occurs before the expiration of the period specified in subparagraph (A)**; or
>
>     (2) the time the case is closed or dismissed.

11 U.S.C. § 546(a) (emphasis added).

Venture filed voluntary petitions for relief under Chapter 11 on March 28, 2003. Section 301(b) of the Bankruptcy Code provides that "[t]he commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter." Therefore, under § 301(b), "the order for relief" in this case was entered on March 28, 2003.

The cases were converted to Chapter 7 on January 17, 2006. For purposes of § 546(a), the conversion of the cases to Chapter 7 did not change the date of the order for relief. *See* 11 U.S.C. § 348(a).

Two years from the entry of "the order of relief" (March 28, 2003) was March 28, 2005. Stuart A. Gold was appointed as the Chapter 7 Trustee on January 19, 2006, *after* the expiration of "2 years after the entry of the order for relief" (March 28, 2005). Therefore, as conceded by Gold, the deadline to file a fraudulent transfer action under both §§ 544 and 548 was March 28,

34

2005. Because Gold did not file his adversary complaint until March 31, 2006, his fraudulent transfer claims under §§ 544 and 548 are time-barred.

### b. Gold's "direct" fraudulent transfer claim under Mich. Comp. Laws Ann. § 566.34(1)(b)

The Court concludes that Gold lacks standing to bring a so-called "direct" fraudulent transfer claim under Mich. Comp. Laws Ann. § 566.34(1)(b), in his capacity as successor-in-interest to the Venture debtors. "'Causes of action commenced by a trustee on behalf of a debtor estate fall into two broad categories: (1) actions brought by the trustee as successor to the debtor's interests included as property of the estate under 11 U.S.C. § 541,[58] and (2) actions brought under one of the trustee's avoidance powers [under the Bankruptcy Code].'" *Rieser v. Hayslip* (*In re Canyon Systems Corp.*), 343 B.R. 615, 655-56 (Bankr. S.D. Ohio 2006) (quoting *Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996)); *see also The State Bank and Trust Co. v. Spaeth* (*In re Motorwerks, Inc.*), 371 B.R. 281, 288-89 (Bankr. S.D. Ohio 2007)(citing *Honigman v. Comerica Bank* (*In re Van Dresser Corp.*), 128 F.3d 945, 947 (6th Cir.1997)).

The Trustee here sought to avoid Venture's allegedly fraudulent transfers both as successor to debtor's interests brought into the estate under § 541, and under his avoidance powers under §§ 544 and 548.

Because the Trustee is barred from using his statutory avoidance powers under §§ 544 and 548, he must rely solely on his power as successor to the interests of Venture for standing to bring a claim to avoid Venture's allegedly fraudulent transfers under Mich. Comp. Laws Ann.

---

[58] Under § 541(a)(1), the commencement of a bankruptcy case "creates an estate . . . comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case." "[I]t is 'well established that the "interests of the debtor in property" include "causes of action."'" *Honigman v. Comerica Bank* (*In re Van Dresser Corp.*),128 F.3d 945, 947 (6th Cir.1997)(citation omitted).

§ 566.34(1)(b).  In that capacity, the Trustee "may assert causes of action belonging to the

Debtor." *Rieser*, 343 B.R. at 657.  "If, on the other hand, a cause of action belongs *solely* to the

estate's creditors, then the trustee has no standing to bring the cause of action." *Honigman v.*

*Comerica Bank* (*In re Van Dresser Corp.*), 128 F.3d 945, 947 (6th Cir.1997)(internal quotation

marks and citation omitted).  "Whether a creditor has sole right to a cause of action is determined

in accordance with state law." *Honigman*, 128 F.3d at 947 (citation omitted).

Mich. Comp. Laws Ann. § 566.34(1)(b) is a provision of the Uniform Fraudulent

Transfer Act, which Michigan adopted in 1998.  "The Uniform Fraudulent Transfer[] Act was

designed to protect **unsecured creditors** against debtors who make transfers out of, or make

obligations against, the debtor's estate in a manner adverse to the creditors' rights." *Michigan*

*Machine Tool Control Corp.,* 381 B.R. at 667 (emphasis added).  Mich. Comp. Laws Ann.

§ 566.34(1)(b) provides:

> (1) A transfer made or obligation incurred by a debtor is fraudulent
> **as to a creditor**, whether the creditor's claim arose before or after
> the transfer was made or the obligation was incurred, if the debtor
> made the transfer or incurred the obligation . . .
>
> (b) Without receiving a reasonably equivalent value in exchange
> for the transfer or obligation, and the debtor did either of the following:
>
> (i) Was engaged or was about to engage in a business or a
> transaction for which the remaining assets of the debtor were
> unreasonably small in relation to the business or transaction.
>
> (ii) Intended to incur, or believed or reasonably should have
> believed that he or she would incur, debts beyond his or her ability
> to pay as they became due.

(Emphasis added).

Consistent with the highlighted statutory language just quoted, and with the purpose behind the Uniform Fraudulent Transfer Act of protecting unsecured creditors, Mich. Comp. Laws Ann. § 566.34(1)(b) provides a cause of action only to a **creditor** who has been harmed by a debtor's transfer or incurring of an obligation. The debtor/transferor has no such cause of action.[59] Because only a creditor has the right to bring a fraudulent transfer claim under Mich. Comp. Laws Ann. § 566.34(1)(b), Venture did not have standing at the commencement of the case to bring a fraudulent transfer claim directly under that statute. Venture, like its successor the Trustee, could only bring such an action through § 544's avoiding powers. Therefore, the Trustee, when acting in the capacity as the successor to Venture, lacks standing to bring a fraudulent transfer claim directly under Mich. Comp. Laws Ann. § 566.34(1)(b).

Because Gold can only bring his fraudulent transfer claim under the Michigan statute through his avoidance powers under § 544, and because his § 544 and § 548 claims are time-barred by § 546(a), all of the Trustee's fraudulent transfer claims must be dismissed.

### B. Deloitte's other grounds for dismissal of Gold's malpractice claim

Because the Court has determined that Gold's malpractice claim (Count I) is not barred by the statute of limitations, the Court must now decide whether this claim should be dismissed based on any other ground that Deloitte asserted in its motion.

Deloitte's motion seeks dismissal of this claim based on the additional grounds that (1) Gold cannot satisfy the causation element of his negligence claim; and (2) Michigan's "wrongful

---

[59] *See* Steven Shareff, *Causes of Action To Set Aside or Recover For Fraudulent Transfer or Obligation Under Uniform Fraudulent Transfer Act*, 26 COA 773 at 17, § 3 (First Series 2008) (discussing the elements of a constructively fraudulent transfer under the § 4(a)(2) of the Uniform Fraudulent Transfer Act, after which Mich. Comp. Laws Ann. § 566.34(1)(b) was modeled).

conduct rule" bars the claim. The Court agrees with the first of these arguments, based on the

allegations in Gold's First Amended Complaint, and concludes that Deloitte's motion to dismiss

should be granted for this reason.

### 1. The causation element of Gold's malpractice claim

To establish a prima facie case of negligence under Michigan law,

> a plaintiff must be able to prove four elements: (1) a duty owed by
> the defendant to the plaintiff, (2) a breach of that duty, (3)
> causation, and (4) damages. Proof of causation requires both cause
> in fact and legal, or proximate, cause. Cause in fact requires that
> the harmful result would not have come about but for the
> defendant's negligent conduct. On the other hand, legal cause or
> 'proximate cause' normally involves examining the foreseeability
> of consequences, and whether a defendant should be held legally
> responsible for such consequences.

*Haliw v. Sterling Heights,* 627 N.W.2d 581, 588 (Mich. 2001)(internal quotation marks and

citations omitted).

### a. Deloitte's position

Deloitte argues that, based on Gold's allegations, Gold cannot satisfy the causation

element of his professional negligence claim. Deloitte argues that "[P]laintiff must allege facts

showing that *Venture* detrimentally relied on Deloitte's audit report" to survive Deloitte's motion

to dismiss based on Gold's failure to establish causation.[60] Deloitte says that Gold's First

Amended Complaint contains no allegation that *Venture* relied on Deloitte's audit reports.[61] Nor

---

[60] Memorandum in Supp. of Deloitte's Mot. To Dismiss (Docket # 7) at 14-15 (emphasis added); Reply Memorandum in Supp. of Deloitte's Mot. To Dismiss (Docket # 21) at 4; Def. Deloitte's Mem. In Opp'n To Pl.'s Mot. To Amend Scheduling Order And/Or For Leave To File A First Am. Compl. (Docket # 70) at 9.

[61] Def. Deloitte's Mem. in Opp'n To Pl.'s Mot. to Amend Scheduling Order And/Or For Leave
(continued...)

can Gold make this allegation, according to Deloitte, because Winget caused Venture to engage in, and thus knew of, the related-party transactions, and Winget's knowledge must be imputed to Venture. Deloitte argues further that Gold cannot establish the causation element by using the alleged reliance on Deloitte's audit reports by *third parties* (Venture's creditors,) who allegedly could have rescued Venture had Deloitte properly disclosed the unfair related-party transactions.[62]

### b. Gold's position

Gold argues that he does not need to allege that anyone detrimentally relied on Deloitte's audit reports, because reliance is not an element of professional negligence claim. Gold also argues that in any event, he has pled such reliance. Gold points to the allegations in the First Amended Complaint that independent third parties (*i.e.*, Venture's noteholders, an independent member of the Fairness Committee, and indenture trustees,) detrimentally relied on Deloitte's audit reports. Gold further alleges that these independent third parties had the power to make Winget stop making the unfair related-party transactions had they known about them, and thus prevent the further siphoning of Venture's assets by Winget.[63] Gold also argued, for the first time at the hearing on Deloitte's motion, that *Venture* itself detrimentally relied on Deloitte's audit reports.

---

[61](...continued)
To File A First Am. Compl. (Docket # 70) at 9, 11.

[62] Reply Memorandum in Supp. of Deloitte's Mot. To Dismiss (Docket # 21) at-3 4; Def. Deloitte's Mem. In Opp'n To Pl.'s Mot. To Amend Scheduling Order And/Or For Leave To File A First Am. Compl. (Docket # 70) at 9-11.

[63] Pl.'s Br. in Opp'n to Deloitte's Mot. to Dismiss (Docket # 10) at 2-3; Pl.'s Mot. for Leave to Submit Supplemental Authority in Opp'n to Def.'s Mot. to Dismiss Pl.'s First Am. Compl. (Docket # 103) at 1-4.

### c. Discussion

### i. Gold does not allege that Venture relied on Deloitte's audit reports.

Gold's First Amended Complaint does not contain any allegations that can reasonably be construed as alleging that *Venture* detrimentally relied on Deloitte's audit reports, and none of Gold's briefs in opposition to Deloitte's motion to dismiss contain any such allegation. In fact, Gold repeatedly stated in his briefs that Deloitte caused Venture harm because *third parties,* rather than Venture, detrimentally relied on its audit reports. In Plaintiff's Brief In Opposition to Deloitte & Touche LLP's Motion to Dismiss (Docket # 10) on page 16, Gold states:

> To establish causation, the Trustee need not show that Venture detrimentally relied upon Deloitte's audit opinions. To the contrary, the Complaint amply establishes [that] Deloitte's audit failure directly and proximately caused injury to Venture because the audited financial statements were relied upon **not by Venture, but by third parties** – i.e., the noteholders, the Indenture trustees, and the independent member of the Fairness Committee – all of whom had the power to take action to prevent Winget's looting of Venture had the audited financial statements accurately disclosed the unfair related-party transactions.[64]

Although these statements related to Gold's original complaint, Gold's First Amended Complaint likewise does not allege that *Venture* detrimentally relied on Deloitte's audit reports, and Gold incorporated the arguments from his prior briefs into his response to Deloitte's motion to dismiss the First Amended Complaint.[65]

---

[64] *See also* Pl.'s Br. in Supp. of Mot. to Amend Scheduling Order and/or for Leave to File a First Am. Compl. (Docket # 64 ) at 7 (same).

[65] Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss Pl.'s First Am. Compl. (Docket # 90) at 1. ("The Court should deny Deloitte's renewed motion [to dismiss] for the same reasons it should have denied Deloitte's original motion, which became moot upon the filing of the Amended Complaint.").

In his First Amended Complaint, Gold alleges only that third parties — creditors and creditor representatives — relied on the Deloitte audit reports.[66] And the "independent" member of the "Fairness Committee" was not a shareholder, officer, director, or management employee of Venture. Rather, Gold alleges he was "independent of Venture and its principals,"[67] essentially, an agent of Venture's creditors.

The Court must determine whether the factual allegations in Gold's First Amended Complaint are legally sufficient to establish the causation element of Gold's malpractice claim. The Court concludes they are not, because Gold must allege that *Venture* detrimentally relied on Deloitte's audit reports. Not only has Gold not alleged this, but also the allegations in Gold's First Amended Complaint show that Gold could not show such reliance by Venture.

### ii. Gold must allege that *Venture* relied on Deloitte's audit reports; third-party reliance is insufficient.

Gold is incorrect in arguing that he need not show reliance by *Venture* — Deloitte's client — as an element of his malpractice claim against Deloitte. To satisfy the causation element of a client's professional negligence claim like this against its accountant, the client must prove that it relied on materially false statements and/or material nondisclosures in audit reports of the accountant. For example, in *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 964-65 (9th Cir. 1990) the court of appeals stated:

> [Plaintiffs-]Appellants must present some evidence establishing the element of **causation, in the sense of actual and justifiable reliance upon misrepresentations or omissions of material fact**

---

[66] First Am. Comp. (Docket # 79) at 3 ¶5 ("independent third parties"); 62 ¶ 305 (creditor NBD); 63 ¶ 316 (noteholders and indenture trustees); 63-64 ¶ 317 ("Venture's creditors").

[67] *Id.* at 63 ¶ 312.

41

[in the 1981 financial statement audited by their accountant and the
1982 unaudited financial data provided by the accountant to the
plaintiffs] to avoid summary judgment on their professional
negligence . . . claims. . . . **[A] plaintiff's reliance on a
professional's misrepresentations is an element of professional
negligence of the variety alleged here**.

(emphasis added)(applying California law). In *PNC Bank, Kentucky, Inc. v. Housing Mortg.
Corp.*, 899 F. Supp. 1399, 1403 (W.D. Pa. 1994), the Housing Mortgage Corporation ("HMC")

filed a complaint against its accountant for negligence in preparing audit reports, and in applying

Pennsylvania law, the court stated that "if [the accountant] can establish, based upon the

pleadings and admissions on file, that HMC did not rely upon the audits in conducting its affairs,

then it will be entitled to dismissal of HMC's claims for negligence." *See also Federal Deposit

Ins. Corp. v. Ernst & Young*, 967 F.2d 166, 170 (5th Cir. 1992)(applying Texas law).

It is not sufficient for Gold to allege that parties other than Venture, who allegedly had

the power to rescue Venture by stopping Winget from engaging in related-party transactions,

relied on Deloitte's audit reports. In *Federal Deposit Ins. Corp. v. Ernst & Young*, 967 F.2d 166

(5th Cir. 1992), for example, the court of appeals rejected such an argument. In that case, the

Federal Deposit Insurance Corp. ("FDIC"), as assignee of Western Savings Association

("Western"), sued Western's auditor for professional negligence based on the auditor's alleged

inaccurate audit reports. 967 F.2d at 168-69. The FDIC argued that even if Western did not rely

on the auditor's audit reports, the auditor's "alleged negligence caused the losses because had the

audits been accurate, someone, such as Western's creditors or government regulators, would

have 'rescued' Western." *Id.* at 171. The court held that Western could not show that the audit

reports caused its damages based on the reliance of third parties. The court stated :

42

> [Western's] argument is flawed because it is not an appropriate
> argument for Western, or its assignee, to make. Western cannot
> claim it should recover from [its auditor] for not being rescued by a
> third party for something Western was already aware of and chose
> to ignore. Neither can Western's assignee make the claim. The
> FDIC in its own capacity or Western's creditors might be able to
> make this claim, but the FDIC brought this suit only on Western's
> behalf.

*Id.* at 171. Although *FDIC* applied Texas law, and there do not appear to be any Michigan cases directly on point, the Court finds *FDIC* persuasive and concludes that Michigan courts would follow it.

Gold therefore cannot use the reliance of *third parties* on the Deloitte audit reports to establish causation for Gold's malpractice claim against Deloitte. Rather, to satisfy the causation element of his claim, which he brings in his capacity as the successor-in-interest to Venture, Gold must allege that *Venture* detrimentally relied on Deloitte's audit reports. As stated above, Gold did not allege this in his First Amended Complaint. And as discussed below, even if Gold *had* alleged that Venture detrimentally relied on Deloitte's audit reports, the facts alleged in the First Amended Complaint show that Gold could not prove this.

> iii. **Under Michigan law, Winget's knowledge is imputed to Venture and thus Gold cannot show that Venture relied on Deloitte's audit reports.**

Gold alleges that Winget, Venture's sole shareholder, caused Venture to engage in, and had knowledge of, the unfair related-party transactions complained of, which allegedly were the means by which Winget improperly siphoned millions of dollars from Venture. Under Michigan agency law,[68] Winget's knowledge is imputed to Venture in this context.

_____

[68] *See O'Melveny & Meyers v. Federal Deposit Ins. Corp.*, 512 U.S. 81, 84-85, 89 (1994)(holding
(continued...)

### a. The general agency rule of imputing the corporate agent's knowledge to the corporation

Under Michigan agency law, the general rule is that the knowledge of corporate officers, employees, and agents, acting within the scope of their authority or employment, is imputed to the corporation. *Kingsley Associates, Inc. v. Moll Plasticrafters, Inc.*, 65 F.3d 498, 504 (6th Cir. 1995)(holding that, under Michigan law, the corporate defendant "may be charged with the knowledge of any of its officers or management employees who acquired knowledge of [the contractual provision at issue] while acting within the scope of their employment"); *Upjohn Co. v. New Hampshire Ins. Co.*, 476 N.W.2d 392, 400 (Mich. 1991) (stating that "knowledge acquired by employees within the scope of their employment is imputed to the corporation.")(internal quotation marks and citation omitted); *see also Gordon Sel-Way, Inc. v. Spence Brothers, Inc.*, 440 N.W.2d 907, 911 (Mich. Ct. App. 1989), *aff'd in part and rev'd in part on other grounds*, 475 N.W.2d 704 (Mich. 1991)("A corporation is merely a legal fiction acting through its officers and agents. One of the burdens of acting under the corporate form is that the law will impute the knowledge of individual officers and employees at a certain level of responsibility to the corporation.")(citation omitted).

### b. The illegal-conduct requirement of Michigan's "wrongful conduct rule" is not a requirement for imputing the corporate agent's knowledge to the corporation

---

[68](...continued)
that where federal receiver's malpractice and breach-of-fiduciary duty claims against law firm were based on California law, rather than federal law, that state's law rather than federal law governed the issue of whether a corporate officer's knowledge of alleged fraudulent conduct or negligent acts could be imputed to the corporation).

44

At this point, the Court must pause to discuss an argument concerning Michigan's "wrongful conduct rule." At least with respect to imputing the wrongful *conduct* of a corporate agent to the corporation, and the effect of imputing such conduct to the corporation, Michigan law recognizes a form of the "wrongful conduct rule." The Michigan Supreme Court has described Michigan's wrongful-conduct rule in this way:

> When a plaintiff's action is based, in whole or in part, on his own illegal conduct, a fundamental common-law maxim generally applies to bar the plaintiff's claim:
>
> > [A] person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party.
>
> When a plaintiff's action is based on his own illegal conduct, and the defendant has participated equally in the illegal activity, a similar common-law maxim, known as the "doctrine of in pari delicto" generally applies to also bar the plaintiff's claim:
>
> > [A]s between parties in pari delicto, that is equally in the wrong, the law will not lend itself to afford relief to one as against the other, but will leave them as it finds them.

*Orzel v. Scott Drug Co.*, 537 N.W. 2d 208, 212-13 (Mich. 1995)(citations omitted). "To implicate the wrongful-conduct rule, the plaintiff's conduct must be prohibited or almost entirely prohibited under a penal or criminal statute." *Id.* at 214.

Deloitte has argued, as another reason to dismiss Gold's malpractice claim, that Michigan's wrongful conduct rule bars Gold's claim, based on the conduct of Winget. According to Deloitte, Winget's conduct must be imputed to Venture, and thus to Gold as Venture's successor-in-interest. Deloitte further argues that Winget's conduct "was prohibited or almost entirely prohibited under a penal or criminal statute," as required by the *Orzel* case cited

45

above, so that when Winget's conduct is imputed to Venture and Gold, the wrongful conduct rule applies and bars Gold's malpractice claim.

Deloitte and Gold dispute whether the wrongful conduct rule applies in this case. As part of that dispute, the parties argue extensively over whether Winget's alleged conduct "was prohibited or almost entirely prohibited under a penal or criminal statute." But the Court concludes that it need not resolve that dispute, nor determine whether Michigan's wrongful conduct rule applies, in order to impute Winget's *knowledge* to Venture.

There is nothing in Michigan case law that makes the imputation of *knowledge*, under principles of Michigan agency law, dependent on a finding that an agent of a corporation violated a criminal or penal statute. Such a finding is required to apply Michigan's wrongful conduct rule. But the law of imputing knowledge under general agency law exists separate and apart from Michigan's version of the wrongful conduct rule.

The parties have not cited, and the Court has not found, any Michigan case that required, as a condition for imputing the *knowledge* of an agent of a corporation to the corporation, that the agent had engaged in conduct that is "prohibited or almost entirely prohibited under a penal or criminal statute." Rather, Michigan cases have regularly imputed the knowledge of an agent to the corporation *without* such a finding. *See, e.g., Kingsley Associates, Inc. v. Moll Plasticrafters, Inc.*, 65 F.3d at 504 (applying Michigan law; imputing to the defendant corporation the knowledge of some of its employees of the terms of a contract entered into between a corporation whose assets the defendant corporation had purchased); *Upjohn Co. v. New Hampshire Ins. Co.*, 476 N.W.2d at 400-01 (imputing the knowledge of a discrepancy between amounts of a chemical pumped into an underground storage tank and the tank-level measurements of the amount of

chemical in the tank); *Gordon Sel-Way, Inc. v. Spence Brothers, Inc.*, 440 N.W.2d at 911 (imputing to the defendant corporation the knowledge of some of the employees of the corporation, who were not involved in an arbitration, that the arbitrator had been involved in a prior lawsuit against the corporation).

          **c. Even if the recognized exceptions to the wrongful conduct rule apply to the imputation of *knowledge* to the corporation, those exceptions do not apply in this case**

There are two exceptions to the wrongful conduct rule, known as the "adverse interest exception" and the "innocent decision-maker exception," (also known as the "*Sharp* exception"). Michigan case law recognizes the first of these exceptions, but has not yet accepted or rejected the second of these exceptions. While these are exceptions to the wrongful conduct rule, it is unclear whether, or to what extent, Michigan law would *also* apply these as exceptions to the general rule of imputing the corporate agent's *knowledge* to the corporation. As will be seen below, the language from some of the cases from other jurisdictions indicates that other jurisdictions also apply these exceptions to the imputing of the agent's *knowledge* to the corporation, not just the agent's conduct. On the other hand, Michigan's wrongful conduct rule appears to be rather different from the rule in other jurisdictions, in that Michigan's rule contains an illegal-conduct requirement — *i.e.*, the requirement that the agent's conduct be "prohibited or almost entirely prohibited under a penal or criminal statute." *Orzel*, 537 N.W. 2d at 214.

The Court will assume, without deciding, that the "sole actor" exception and the "innocent decision-maker" exception are not limited to imputing conduct, but also extend to imputing knowledge. Those exceptions nonetheless do not apply in this case.

47

Under the adverse interest exception, the knowledge and acts of a corporate officer, employee, or agent will **not** be imputed to the corporation if the agent acted "solely in his own interest and against the interest of the [corporation.]" *MCA Financial Corp. v. Grant Thornton, L.L.P.,* 687 N.W.2d 850, 857 (Mich. Ct. App. 2004)(citation omitted).

The adverse interest exception is itself subject to an exception, known as the "sole actor rule." The "sole actor rule" exception to the "adverse interest exception" applies where the officer, employee, or agent of a corporation, who is acting adversely to the interests of the corporation,

> is, in essence, the corporation (the "sole actor"). Indeed, it has its roots in cases where the agent and the principal are literally the same person (literally a "sole actor") and thus information obtained by a person in his role as an agent is treated as also being obtained in his role as principal, even if his activities as agent are contrary to his interests as a principal. Therefore, where the wrongdoer acts contrary to the interests of the corporation, under the adverse interest exception the wrongdoer's conduct would not ordinarily be imputed to the corporation. But where the wrongdoer is a sole actor, the adverse interest exception is not applied **and his wrongdoing is nevertheless imputed to the corporation. For example where a sole shareholder loots the corporation of its assets the adverse interest exception will not apply.**

*Id.* at 860 (emphasis added)(citations and footnote omitted). In *Mediators Inc. v. Manney* (*In re Mediators, Inc.*),105 F.3d 822, 827 (2d Cir. 1997), a case relied on by the Michigan Court of Appeals in *MCA Financial*, quoted above, the court stated:

> **[T]he adverse interest exception does not apply to cases in which the principal is a corporation and the agent is its sole shareholder.** As noted, the adverse interest exception is to a presumption that an agent has discharged the duty of disclosing material facts to the principal. Under New York law, where the agent is defrauding the principal, such disclosure cannot be presumed because it would defeat-or have defeated-the fraud.

48

> However, where the principal and agent are one and the same, the
> adverse interest exception is itself subject to an exception styled
> the "sole actor" rule. Harold Gill Renschlein & William A.
> Gregory, *The Law of Agency and Partnership* § 64 at 121 (2d ed.
> 1990). **This rule imputes the agent's knowledge to the principal**
> **notwithstanding the agent's self-dealing because the party that**
> **should have been informed was the agent itself albeit in its**
> **capacity as principal.**

*Id.* (emphasis added)(citations omitted); *cf.* Jonathan Witmer-Rich & Mark Herrmann, *Corporate Complicity Claims: Why There is No Innocent Decision-Maker Exception to Imputing an Officer's Wrongdoing to a Bankrupt Corporation,* 74 Tenn. L. Rev. 47, 61 (2006)(explaining that under the sole actor rule "even when an officer-agent acts with wholly adverse interest, the agent's wrongdoing is imputed to the corporation-principal when the officer-agent is the sole actor of the corporation, thereby barring the corporation's claims against third parties").

Because Winget, the agent, was the sole shareholder of Venture, the sole actor exception to the adverse interest exception applies here. Under Michigan agency law, Winget's knowledge of the related-party transactions would therefore be imputed to Venture, thereby making it impossible for Venture to show that *it* relied on Deloitte's audit reports.

Gold, relying on *MCA Financial*, argues that even if the Court determines that the "sole actor rule" applies, the Court should apply an exception to the sole actor rule, sometimes referred to as the "*Sharp* exception," and not impute Winget's knowledge to Venture.[69] The "*Sharp* exception," which is also referred to as "the innocent decision-maker exception" or "the innocent insider exception," derives from a statement in *Sharp Int'l Corp. v. KPMG LLP* (*In re Sharp Int'l Corp.*), 278 B.R. 28, 36 (Bankr. E.D.N.Y. 2002), that, where there are multiple directors and

---

[69] Pl.'s Br. in Opp'n to Deloitte's Mot. to Dismiss (Docket # 10) at 13-15.

officers, "management's fraudulent conduct and knowledge will not be imputed to the corporation if the complaint alleges that there was at least one **innocent member of management** who could or would have been able to prevent the fraud had he known about it." *Id*. (citation omitted)(emphasis added).

The *Sharp* court relied, in part, on *Bankruptcy Services, Inc. v. Ernst & Young* (*In re CBI Holding Co., Inc.*), 247 B.R. 341, 364-65 (Bankr. S.D.N.Y. 2000)(*CBI I*), *aff'd in part and rev'd in part,* 311 B.R. 350 (S.D.N.Y. 2004)(*CBI II), on reh'g vacated*, 318 B.R. 761 (S.D.N.Y. 2004)(directing final judgment be entered in favor of defendants)(*CBI III*), *aff'd in part and rev'd in part and remanded,* 529 F.3d 432 (2d Cir. 2008)(*CBI IV*). S*harp*, 278 B.R. at 36. In *CBI I*, the court stated that "a corporation whose management was involved in an accounting fraud is not barred from asserting claims for professional malpractice in not detecting the fraud, provided the corporation had at least **one decision-maker in management or among its stockholders** who was innocent of the fraud and could have stopped it." *CBI I*, 247 B.R. at 364 -65 (emphasis added)(citation omitted).

Gold's reliance on the so-called "*Sharp* exception" is unavailing. First, Michigan courts have not yet adopted the exception. *See MCA Financial,* 687 N.W.2d at 860-61 (stating that the Plaintiff's reliance on *Sharp* was misplaced because *Sharp* applied New York law, not Michigan law, and declining to consider whether to apply *Sharp*, because it found that the sole actor rule did not apply).

Second, even assuming that Michigan courts would adopt the *Sharp* exception to the "sole actor rule" the allegations in Gold's First Amended Complaint are insufficient to show that the exception applies in this case. The cases, including those cited by Gold, have applied the

50

*Sharp* exception only where an innocent decision-maker exists, who was a member of the management of the corporation (*e.g.*, a director or officer) or a shareholder of the corporation, and that innocent decision-maker has the power to stop the wrongful activity of the corporation. Gold's First Amended Complaint fails to allege that any of the "innocent third parties" in this case (*i.e.*, the noteholders, indenture trustees, or the independent member of the Fairness Committee) were directors, officers, members of the management, or shareholders of Venture. As noted above, all of these "third parties" were creditors or creditor representatives. And the independent member of the Fairness Committee, according to Gold, was "independent of Venture and its principals."[70]

Finally, relying on *Bondi v. Grant Thorton, Int'l* (*In re Parmalat Securities Litigation*), 421 F. Supp. 2d 703 (S.D.N.Y. 2006), and *Ash v. Georgia-Pacific Corp.*, 957 F.2d 432 (7th Cir. 1992), Gold argues that even if the *Sharp* exception does not apply, the Court still should not apply the "sole actor rule" because Deloitte knew that Winget was acting against the interest of his principal, and Deloitte participated in the wrongdoing. In *Ash*, the court stated:

> None of the "sole actor" cases we could find allows the imputation of knowledge to the principal where the adverse party knew that the agent was acting adversely to his employer-where, indeed, the adverse party participated in the fraud. Georgia-Pacific's argument implies that anyone who suborns the chief operating officer of a corporation has by virtue of that success purchased immunity from liability to the principal victim. We cannot believe that Illinois treats successful schemes as self-protecting.

957 F.2d at 436; *see also Parmalat*, 421 F. Supp. at 715 (citing the above quotation from *Ash* with approval).

---

[70] First Am. Compl. (Docket # 79) at 63 ¶ 312.

Gold's reliance on *Parmalat* and *Ash* is misplaced. In both *Parmalat* and *Ash*, the corporate wrongdoer was not the corporation's sole shareholder. The sole actor rule did not apply because the corporate principal was not the same as the corporate agent. In *Parmalat*, the court distinguished the sole actor rule cases upon which the defendants relied, where the courts were "concerned with the fairness of allowing small corporations that act only through one or two individuals to disclaim knowledge of those agents' activities," from the case before it, where there was "no equivalent risk of [the corporation's] agents being seen by others as indistinguishable from the company." *Parmalat*, 421 F.Supp. at 715. Likewise, in *Ash*, the court found that the corporate agent who was the wrongdoer, the Chief Operating Officer of the corporation, was not the same as the corporation, which had another person as the dominant shareholder. Therefore, *Ash* and *Parmalat* are not like this case.

For these reasons, Winget's knowledge is imputed to Venture, thereby making it clear that Gold cannot prove, as he must, that *Venture* relied on Deloitte's audit reports.

### 2. Michigan's wrongful conduct rule

As noted above, Deloitte also argues that Gold's professional negligence claim must be dismissed because it is barred by Michigan's wrongful conduct rule. The parties have raised interesting issues regarding the application of the wrongful conduct rule. One such issue is whether Winget violated a criminal or penal statute (the threshold requirement for application of the wrongful conduct rule). Another issue is whether, after the Michigan Supreme Court's decision in *Trentadue v. Gorton*, 738 N.W.2d 664 (Mich. 2007), Michigan's wrongful conduct rule must be viewed as abrogated by Michigan's comparative fault statute, Mich. Comp. Laws

52

Ann. § 600.6304.  The Court does not need to decide these issues.  Rather, Gold's malpractice claim against Deloitte must be dismissed for the reasons discussed above.

## V.  Conclusion

For the reasons stated in this opinion, the Court will enter an order dismissing Gold's fraudulent transfer claim (Count IV in Gold's First Amended Complaint).  And the Court will recommend that the United States District Court enter a final order dismissing Gold's professional negligence claim (Count I); aiding and abetting breach-of-fiduciary duty claim (Count II), and  disgorgement-of-fees claim (Count III).

**Signed on October 16, 2008**                    **/s/ Thomas J. Tucker**
                                                                    **Thomas J. Tucker**
                                                                    **United States Bankruptcy Judge**